UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

BARBARA BURNETT,

     Plaintiff,    Case No.: 10-14739
            Honorable Stephen J. Murphy, III
    v.      Magistrate Judge David R. Grand

MICHAEL ASTRUE,
Commissioner of Social Security,

     Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [12, 19]**

Plaintiff Barbara Burnett brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act").  Both parties have filed summary judgment motions which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.  RECOMMENDATION**

For the reasons set forth below, the court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") assessment that Burnett retained the residual functional capacity ("RFC") to do a limited range of sedentary work.  Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [19] be **GRANTED**, Burnett's motion [12] be **DENIED** and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be **AFFIRMED**.

II.    **REPORT**

A.    **Procedural History**

On November 8, 2000, Burnett filed an application for DIB, alleging disability as of February 10, 2000. (Tr. 44-46). In a decision dated January 16, 2003, Burnett was awarded a closed period of disability from February 10, 2000, to December 6, 2001. (Tr. 281-288). Burnett did not appeal this decision. Burnett filed a subsequent claim for DIB and SSI on February 21, 2003, originally alleging an onset date of February 10, 2000, but later amending that date to January 17, 2003, the day after the original decision. (Tr. 292; 400-402; 914-16). The claim was denied initially on May 29, 2003. (Tr. 918-21). Thereafter, Burnett filed a timely request for an administrative hearing, which was held on April 10, 2006, before ALJ Kathryn Burgchardt. (Tr. 1411-44). Burnett, represented by an attorney, testified, as did Vocational Expert ("VE") Harry Cynowa. (*Id.*). In a decision dated August 7, 2006, the ALJ found Burnett not disabled. (Tr. 292-301). On December 7, 2007, the Appeals Council issued an order remanding the case for rehearing because the hearing transcript from the April 10, 2006, hearing could not be located. (Tr. 338-40). On July 27, 2007, Burnett filed new claims for DIB and SSI, alleging a new disability onset date of August 9, 2006. (Tr. 978-86). On December 8, 2008, a new hearing was held before ALJ Roy Roulhac. (Tr. 1454-1486). Burnett testified, again represented by counsel, and VE Cynowa also testified again. (*Id.*). The ALJ also accepted additional medical records from Burnett. (Tr. 1445-53). In a decision dated May 18, 2009, the ALJ found that Burnett was not disabled. (Tr. 925-37). On October 28, 2010, the Appeals Council denied review. (Tr. 13-15). Burnett filed for judicial review of the final decision on November 30, 2010 [1] – the matter presently before the court.

2

**B.     Background**

As seen above, this case has a long history, and the file contains a voluminous amount of medical and other records dating back to 1999.  However, because Burnett's alleged onset date is August 9, 2006, the court will only address medical evidence preceding that date to the extent it sheds light on the conditions Burnett alleges as currently disabling.

*1.     Disability Reports From The Alleged Onset Date*

In an undated disability report, Burnett alleged that the following disabling conditions prevent her from working: congestive heart failure, sleep apnea, chronic obstructive pulmonary disease ("COPD"), bilateral moderate carpal tunnel syndrome ("CTS"), problems with her knees and L5-S1 radiculopathy.  (Tr. 1008).  She claimed that these conditions prevent her from working because she cannot walk more than ¼ to a ½ a block, cannot stand more than 10 minutes, has to elevate her legs when sitting, cannot lift over 10 pounds, has trouble gripping, and has chest pains and breathing problems.  (*Id.*).  In addition, she asserted that her sleep apnea keeps her up at night because she stops breathing in the night and then needs to take 5 15-minute naps during the day.  (*Id.*).  She also reported that she cannot bend because of her "things," presumably her conditions, and that she was diagnosed with heart failure in November of 2006. (*Id.*).  Burnett reported being prescribed a large number of medications for her conditions and that she has no side effects from any of her medications.  (Tr. 1013).

In a function report dated August 23, 2007, Burnett's daily activities were reported as getting out of bed, washing her face and hands and making the bed occasionally; getting her daughter ready for school (including occasionally making breakfast), dropping her off and picking her up at school, attending school meetings, driving to the homes of family members, talking on the phone and watching television.  (Tr. 1020).  She reported that she cared for her

daughter's needs with the help of her family, but that she herself had some trouble with self-care including dressing, getting out of the tub, hair car and shopping (reaching items and carrying bags). (Tr. 1021). Burnett stated that her conditions prevent her from sleeping at night and as a result she sleeps during the day. (*Id.*). She also reported being short of breath. (*Id.*). Burnett reported cooking approximately twice a week for her daughter, which took 30 minutes to an hour, and being able to do light housework twice a week, including dusting, light ironing, and making the bed. (Tr. 1022). Burnett reported needing assistance with yard work, laundry, cooking, vacuuming and mopping. (*Id.*). She reported going out three to four times a week and being able to drive a car. (Tr. 1023). She reported shopping two to three times a month for an hour or two at a time. (*Id.*).

Burnett reported that her interests include going to the movies, which she does once a month, attending church weekly, parenting and social groups about three times a month, reading, talking on the phone and visiting with family about twice a week. (Tr. 1024). Burnett checked off the boxes on the form indicating her conditions limit her abilities in the following areas: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, memory, completing tasks, concentration, and using hands. (Tr. 1025). She indicated that she can only lift ten pounds, only squat, bend, stand, reach, walk, sit and kneel for a limited time, that stair climbing bothers her knees and ankles, that her memory and concentration are often negatively affected by stress and that her CTS makes it difficult to use her hands. (*Id.*). Burnett also indicated that her medicines put her to sleep. (*Id.*). She reported that she has been prescribed a cane for walking, braces for her hands, and a CPAP machine for her sleep apnea. (Tr. 1026).

On an asthma form dated August 23, 2007, Burnett reported that she has never been hospitalized or seen in the emergency room for asthma attacks, but that all attacks were treated at

home with an inhaler. (Tr. 1028). She reported that activities such as climbing stairs and housework brings on attacks, and sometimes they come on by themselves. (*Id.*). She also reported difficulty with breathing between attacks. (Tr. 1029). She reported her height as 5'8" and her weight as 334 lbs. (*Id.*).

In an undated disability appeals report, Burnett reported that her CTS had worsened and that surgery was now being recommended. (Tr. 1048). She also reported that she cannot stand more than 5-10 minutes at a time, cannot lift more than 10 pounds, and needs to take 4 15-minute naps a day. (*Id.*). She again reported no side effects from her medications. (Tr. 1051).

In an undated recent medical treatment form, Burnett stated that her doctor informed her that her carpal tunnel had worsened to the point of needing surgery, and that another doctor had recommended "gastro" surgery if she wanted to live to see the next ten years. (Tr. 461). She reported that the same doctor suggested she has mental limitations from her sleep apnea. (Tr. 464). In a second undated recent medical treatment form, Burnett reported that she was recently diagnosed with diabetes, that she has had her gallbladder removed and that she had been observed for chronic heart failure and chest pains. (Tr. 1059).

2.      *Relevant Disability Reports From Prior to the Alleged Onset Date*

In a disability field office report dated February 21, 2003, the interviewer noted that Burnett appeared to have difficulty concentrating, answering, standing and walking, and noted that Burnett cried constantly during the interview. (Tr. 420-422). In a pain questionnaire dated March 8, 2003, Burnett reported that she suffered from pain in her back and right leg that is worse with standing and walking and the medication did not help. (Tr. 431). She reported feeling sleepy and dizzy because of her medications, but that she had a hard time sleeping due to the pain and had to nap during the day. (Tr. 432-34). In a disability appeals report dated May

5

28, 2003, Burnett reported being prescribed Wellbutrin for depression.  (Tr. 438-39).  In an undated disability field report, Burnett reported depression and thoughts of suicide among her conditions, and noted that the majority of her medications caused side effects such as sleepiness, hallucinations and bowel or urination problems.  (Tr. 440; 445).  She reported being prescribed Zoloft for depression.  (Tr. 445).

### 3.   Plaintiff's Testimony

Burnett testified that her previous job had been as a bus driver, her last position being a medical van transport driver with a hospital, where she had to lift patients in wheelchairs weighing upwards of 300 pounds.  (Tr. 1511-12).  She testified that currently she weighed 324 pounds.  (Tr. 1513).  Burnett testified that she is unable to work because she cannot stand more than five or ten minutes, cannot sit for an extended period of time, her medicine puts her to sleep at odd times and her hands and elbows are in constant pain.  (Tr. 1514-15).  She testified that her pain is generally an eight out of ten when she takes her medicine, and a ten without medicine.  (Tr. 1514).  Burnett testified she can lift and carry 5-10 pounds and that she is able to drive, though her license had been suspended for failure to carry insurance.  (Tr. 1515).  She testified that her day consists of sleeping, watching television in bed, reading, and light cooking.  (Id.).  She goes shopping approximately once a month.  (Id.).  Burnett testified that she can sit comfortably about 15-20 minutes at a time, but for only about two hours in an eight-hour day.  (Tr. 1516).  She testified she can walk a fourth of a block before having to sit and rest.  (Id.).  She testified that she naps approximately 15-20 minutes a day.  (Id.).

### 3.   Medical Evidence

As noted above, the record contains medical treatment notes dating back to 1999.  The court will only discuss records preceding Burnett's alleged disability onset date to the extent they

shed light on her condition as of that date.

a.     Treating Sources

Burnett suffers from a number of conditions, several of which are treated by multiple providers.   Thus, to facilitate the discussion, the court will group her treating records by condition rather than by provider.[1]  The court will then address the several disability opinions her various providers have rendered on her behalf.   Furthermore, because some of her treating physicians' records are illegible, the court will only discuss those portions that are decipherable.

i.     *Depression*

Burnett reported that she was previously prescribed Zoloft and Wellbutrin for depression as recently as 2003.   While her medical records do indicate several reports or diagnoses of depression and/or anxiety by her treating physicians on several occasions, (*see* Tr. 611; 694; 1307), there is not a single record in the voluminous file indicating any treatment of depression or anxiety with medication or therapy.   Nor are there any records indicating hospitalization for depression or anxiety.

ii.     *Arthritis*

Burnett complains of pain from arthritis in her back and neck.   The medical records in the file show arthritis in her back and right knee, however there are no records indicating arthritis or other degenerative changes in her neck.

a.     Lower Back Pain

On July 24, 2002, Burnett reported to her primary physician at the time, Dr. O'Desky, lower back pain radiating to her right leg.  (Tr. 490).  A July 27, 2002, x-ray of Burnett's lumbar

---

[1] In addition to the conditions listed below, Burnett's treating doctors also diagnosed her with chronic obstructive pulmonary disorder, hypertension, and chronic heart failure, and she had repeated foot lesions requiring surgery.  However, the ALJ did not find these conditions severe, and Burnett does not challenge that finding.  Therefore, the court will not address them here.

spine revealed minimal degenerative changes along with spina bifida occulta of a sacralized L5. (Tr. 491). At a follow-up appointment with her foot surgeon on April 30, 2003, Burnett reported that she was using a cane for arthritis in her lower back. (Tr. 745). At a November 29, 2004, appointment with Dr. Lis at her primary care practice, Burnett asked for an x-ray because her legs give out on her. (Tr. 597). There is no indication of an x-ray in the file as a result of this appointment, however. At an appointment with Dr. Lis on January 28, 2005, Burnett reported numbness in her right leg that occurred with sitting down. (Tr. 599). She also reported pain at night and that the Tylenol 3 she had been prescribed was not helping. (*Id.*). However, Dr. Lis only diagnosed her with obesity, hypertension and peripheral vascular disease at that appointment, and did not alter her pain medication regimen. (*Id.*). At a October 7, 2005, appointment with her neurologist, Dr. Policherla, for her sleep apnea, upon examination he noted that her toe-walking, heel-walking and tandem gait were all within normal limits. (Tr. 583). She had 2+ knee and ankle reflexes as well. (*Id.*).

At an appointment with Dr. Ekole at her primary care practice on April 27, 2007, Burnett was assessed with back pain, although her complaint on that date was a dry cough. (Tr. 1106). Otherwise she said she was "doing fine." (*Id.*). On June 28, 2007, at an appointment with Dr. Policherla, Burnett reported leg cramping. (713). The neurologist ordered an EMG. (*Id.*). The EMG, conducted the same day, found left L5-S1 radiculopathy. (Tr. 714-17). At a November 29, 2007, appointment with Policherla, Burnett reported increased lower back pain, but admitted that she was in the process of moving and had been lifting things. (Tr. 623). Dr. Policherla advised Burnett to begin physical therapy and continue with the medications her primary care physician, Dr. Popoff, had prescribed for her, including Tylenol #4, Lexapro and Lyrica. (*Id.*). There are no records in the file relating to any course of physical therapy. At an appointment

8

with Dr. Policherla on January 17, 2008, he recommended that she continue her prescribed medications and that she be rechecked in a month. (Tr. 1393).

b.    Knee Pain

At an appointment with Dr. O'Desky, on January 14, 2004, Burnett reported right knee pain and swelling. (Tr. 586-87). An x-ray taken that same day revealed "narrowing of the medial compartment with minimal spurring." (Tr. 588). At an appointment with Dr. O'Desky on February 23, 2004, Burnett reported that she had fallen the previous Saturday and fractured her left knee. (Tr. 768). She reported that she was "using [the] cane again." (*Id.*). An x-ray taken that day revealed no fracture or other abnormality in her left knee. (Tr. 769). At an appointment with a physician assistant in her primary care office on August 17, 2004, Burnett was diagnosed with a "history" of "knee arthritis" and sought medication refills. (Tr. 596). She was diagnosed with "knee pain" but her regimen remained unchanged. (*Id.*). Other than obesity, hypertension and her knee pain, Burnett denied any other medical complaints at this appointment. (*Id.*). At an appointment on November 11, 2004, with Dr. Lis, Burnett asked for an x-ray "because my legs give out on me." (Tr. 597). The doctor recommended that she return in four weeks for an x-ray, but it does not appear an x-ray was ordered. (*Id.*; Tr. 598-99).

At a September 29, 2005, appointment with Dr. Popoff, Burnett reported pain in her right leg, however the remainder of those treatment notes are illegible. (Tr. 615). At an appointment with Dr. Eastlake at her primary care facility on November 30, 2006, Burnett reported pain in her right leg, and that no medications were helping. (Tr. 852-53). Burnett reported that she was doing fine otherwise. (*Id.*). The doctor ordered an x-ray of her right leg. (*Id.*). The x-ray, taken on December 5, 2006, revealed "mild spur formation at the knee joint, with possible minimal joint space narrowing in the medial compartment." (Tr. 854). At an appointment with Dr.

9

Eastlake on January 30, 2007, Burnett again reported bilateral knee pain, and, upon examination, the doctor noted bilateral knee tenderness. (Tr. 856-67). Burnett's regimen remain unchanged, however. (*Id.*). An EMG and nerve conduction study performed by Dr. Policherla on June 28, 2007, revealed mild bilateral peroneal neuropathy at the knee. (Tr. 714-17). At an appointment with Dr. Eastlake on July 31, 2007, Burnett was diagnosed with osteoarthritis of her knee but there were no changes to her regimen as a result of this diagnosis. (Tr. 900).

*iii.*     *Sleep apnea*

On October 7, 2005, Burnett was referred to neurologist Dr. Policherla for excessive fatigue, occasional snoring, and occasional gasping for breath at night. (Tr. 582-83). Upon examination, Dr. Policherla noted that Burnett was 5'8" and weighed 349 pounds. (Tr. 582). She had a small oropharynx and a large uvula. (*Id.*). His impression was that she was suffering form daytime hypersomnolence and he recommended a full polysomnogram with multiple sleep latency tests and a polysomnogram with nasal CPAP titration, with follow-up after those tests were completed. (Tr. 583). Burnett underwent a polysomnogram on October 27, 2005, which revealed a sleep efficiency of 95%. (Tr. 580). She had 93 respiratory events at the rate of 12 per hour. (*Id.*). Her baseline oxygen saturation was 98%, and her lowest saturation was 88%. (*Id.*). The interpretation was that Burnett suffered from obstructive sleep apnea syndrome and idiopathic hypersomnia versus narcolepsy. (*Id.*). A similar polysomnogram conducted on October 27, 2005, with the help of a CPAP machine recommended that Burnett be fitted with a CPAP machine with 4-6 cm of water pressure for relief of her symptoms. (Tr. 581).

At a follow-up appointment on November 10, 2005, Dr. Policherla prescribed Burnett a CPAP machine at 6 cm of water pressure. (Tr. 579). On December 8, 2005, Burnett attended a follow-up appointment where she complained that the CPAP machine was annoying but that she

was able to sleep five hours at a time while using it.  (Tr. 578).  She still complained of hypersomnolence, so Dr. Policherla prescribed her Provigil and recommended that she continue with the machine.  (*Id.*).  At a follow-up appointment on January 19, 2006, Dr. Policherla noted that he had switched her medication from Provigil to Ritalin due to insurance issues, but that Burnett could not tolerate the Ritalin.  (Tr. 577).  The doctor recommended a narcolepsy panel, noting that if it was positive it would be easy to get her the Provigil, but that he would work to get the medication for her in the meantime.  (*Id.*).  A narcolepsy panel was performed on February 1, 2006, and the results were inconclusive.  (Tr. 574-76; 573).  At a follow-up appointment with Dr. Policherla on March 9, 2006, Burnett complained that she was unable to tolerate her CPAP mask, and the doctor prescribed a different mask but advised that she would need to use the machine nightly to see improvement in her daytime sleepiness.  (Tr. 573).  He again prescribed the Provigil, using a presumptive diagnosis of narcolepsy.  (*Id.*).

At an appointment on April 13, 2006, Burnett again complained that she was having difficulty with her CPAP machine because of discomfort with the mask.  Dr. Policherla wrote her a prescription for a nasal pillow instead.  (Tr. 694).  She was given Metadate instead of Provigil and appeared to be tolerating the medication, although she still felt hypersomnolent. (*Id.*).  At a follow-up appointment on June 12, 2006, Burnett reported using her CPAP machine nightly and doing well.  (Tr. 696).  She also reported an improvement in hypersomnolence with the Metadate.  (*Id.*).  At a follow-up on July 31, 2006, Dr. Policherla continued her CPAP prescription and her Metadate, but added Provigil as well "in view of the insurance."  (Tr. 698).

At an appointment on September 28, 2006, Burnett was set up with a new polysomnogram testing date.  (Tr. 700).  The polysomnogram, conducted on November 2, 2006, revealed that Burnett had a total of 27 respiratory events at the rate of 5 per hour with the help of

a CPAP with 7 cm of water pressure.  (Tr. 701).  She reported continuing to have difficulty feeling tired at times and difficulty with her mind racing in the evening.  (*Id.*).  At a follow-up appointment with Dr. Policherla, he prescribed her a new CPAP with 7 cm of water pressure and a mask.  (Tr. 703).  Based on reports of difficulty falling asleep at night, the doctor also prescribed Klonopin.  (*Id.*).  Her regimen was continued unchanged at an appointment on December 14, 2006.  (Tr. 705).

At an appointment on February 1, 2007, Burnett reported that she was using her CPAP machine at 6 cm water pressure, instead of the 7 cm prescribed, and was advised to increase it.  (Tr. 707).  She also reported that she continued to have problems with tiredness around noon daily.  She was advised to increase her Provigil to twice a day, and to have a repeat narcolepsy panel.  (*Id.*).  The narcolepsy panel, conducted on March 9, 2007, was negative.  (Tr. 709).  At a follow-up with Dr. Policherla on April 5, 2007, Burnett reported that she was only using her CPAP machine intermittently because it made her mouth dry.  (Tr. 711).  The doctor agreed to a request to add humidification to the machine and advised Burnett to use it nightly.  (*Id.*).  Burnett also reported using the Provigil twice a day "with good results."  (*Id.*).  At an appointment on June 28, 2007, Burnett continued to complain about hypersomnolence and difficulty initiating sleep.  (Tr. 713).  However, Dr. Policherla did not change her regimen at this appointment.  (*Id.*).

At an appointment on July 30, 2007, Burnett reported "doing well with reference to hypersomnolence," and her regimen remained unchanged.  (Tr. 718).  A polysomnogram conducted on November 10, 2007, showed a total of 31 respiratory events at the rate of 6 per hour and recommended a CPAP with 13 cm of water pressure.  (Tr. 622).  At an appointment on November 29, 2007, Dr. Policherla increased her CPAP prescription from 7 cm to 9 cm of water pressure.  (Tr. 623).  He also continued her prescription for Klonopin to help her sleep and

12

Provigil to help her with daytime sleepiness.  (*Id.*).  Burnett reported that she was doing well in regards to hypersomnolence.  (*Id.*).

iv.   *Bilateral Carpel Tunnel Syndrome*

At an appointment with Dr. Popoff on June 9, 2005, Burnett complained of hand pain. (Tr. 606).  However, the remainder of the treatment notes from that date are illegible.  (*Id.*).  At an appointment with Dr. Eastlake on August 28, 2006, Burnett complained of arm and shoulder pain, but the court cannot determine if any treatment resulted from that complaint.  (Tr. 844).

At an appointment with Dr. Policherla on June 28, 2007, Burnett complained that she had CTS.  (Tr. 713).  Dr. Policherla ordered an EMG, which revealed "bilateral moderate carpal tunnel syndrome."  (Tr. 713-17).  At a follow-up on June 30, 2007, Dr. Policherla recommended splints, per the EMG results.  (Tr. 718).  At an appointment with Dr. Eastlake on July 31, 2007, Burnett complained of right shoulder pain, and was diagnosed with CTS, but there appear to have been no changes to her treatment regimen as a result.  (Tr. 900).  At an appointment on November 29, 2007, Dr. Policherla recommended that Burnett begin physical therapy on her hands in relation to her CTS.  (Tr. 623).  However, there are no physical therapy records in the file.  An EMG study conducted by Dr. Policherla on January 17, 2008, was positive for "bilateral severe carpal tunnel syndrome."  (Tr. 624-25).

At an appointment with her new primary physician, Dr. Verbovsky on March 11, 2008, Burnett was evaluated as having tenderness in her wrist ligaments and weak grip strength bilaterally.  (Tr. 1397).  The doctor noted to "ask re: inj[ection] in wrists."  (*Id.*).  On April 22, 2008, Dr. Policherla prescribed Topomax for Burnett's CTS.  (Tr. 626; Tr. 910).  Burnett was seen by hand specialist and surgeon, Dr. Kushner, on April 30, 2008. (Tr. 1391-92).  He noted that she presented with her EMG and nerve study from Dr. Policherla and that "it is

13

recommended that she should have surgery." (Tr. 1391). However, upon examination, Dr. Kushner only noted a positive Tinel's signal bilaterally, with no intrinsic muscle wasting or weakness, and with the remainder of soft tissue, bone and joint structures within normal limits. (*Id.*). He diagnosed her with "moderate to severe carpal tunnel syndrome" and recommended a conservative course of treatment including splints and the later possibility of cortisone injections. (Tr. 1391-92). He informed her he would see her back after she had a diabetic workup as that may be a cause of the neuropathy she was experiencing. (*Id.*).

At an appointment with Dr. Policherla on December 2, 2008, the doctor advised Burnett to continue with Topomax for her CTS and have a repeat EMG "to evaluate the need for surgery." (Tr. 910). The repeat EMG, conducted the same day, diagnosed "bilateral moderate carpal tunnel syndrome, better than previous EMG test done in January 2008." (Tr. 912-13).

*v.*     *Diabetes*

At a May 22, 2008, appointment with Dr. Verbovsky, Burnett reported burning in her feet and craving sweets. (Tr. 1395). Dr. Verbovsky ordered blood work. (*Id.*). At a follow-up appointment on May 30, 2008, Burnett was diagnosed with Type II diabetes. (Tr. 1394). However, there are no additional treatment records regarding diabetes in the file.

*vi.*     *Obesity*

Burnett complains of limitations due to her obesity, and her weight has been the subject of a number of treatment records. Burnett's earliest weight was recorded at 326 pounds on December 28, 2000, (Tr. 724), and her latest was 330 pounds on May 30, 2008. At an appointment with Dr. O'Desky on February 6, 2002, although her weight was not noted, it was deemed "stable." (Tr. 484). At an appointment on July 28, 2002, Burnett was noted to be "disregarding advice to lose weight." (Tr. 490). At an October 7, 2005 appointment with Dr.

14

Policherla, Burnett weighed 349 pounds and claimed that her weight had increased 50 pounds over the past year. (Tr. 582). However, notes from a January 14, 2004 appointment with Dr. O'Desky showed Burnett's weight as 350 pounds. (Tr. 586). A majority of Burnett's treatment records diagnosed her with obesity. (*See e.g.* Tr. 586; 596-599; 1078-79; 1119-20; 1173; 1397). In addition, several treating doctors noted that her obesity was a contributing factor to some of her other conditions, such as her repeated foot lesions and her CTS. (Tr. 835; 901-905).

### vii.    *Medication Side Effects*

Burnett alleges in her brief that the side effects of her medication include dizziness, drowsiness, urination and bowel movement problems, diarrhea, sleep problems, weakness and fatigue. Her treatment records reflect only two reports regarding side effects of her medications. On September 30, 2006, Burnett reported doing fine and that she had no side effects to her medications. (Tr. 848-49). On March 28, 2008, Burnett reported to Dr. Verbovsky that her mental capacity had recently been tested by a state agency and that she believed she tested below her actual ability due to medications including Klonopin and Lyrica. (Tr. 1396). However, Dr. Verbovsky did not alter her medication regimen based on this report. (*Id.*). There are reports in the record reflecting incontinence and bowel movement problems, but nothing indicating that those problems were related to medications. (Tr. 724; 972-73). Her reports of drowsiness and sleep problems were all related to her complaints of hypersomnolence, noted above in a preceding section of this background. There are no reports of weakness, diarrhea or fatigue in the legible treatment records.

### viii.    *Treating Physician Medical Statements*

A number of Burnett's treating physicians issued medical statements on her behalf at several points in her treatment. The court will address each physician in turn.

On September 20, 2005, Dr. Popoff issued a medical need form for Burnett, diagnosing her with chronic fatigue syndrome, "body habitus gigantus," and osteoarthritis. (Tr. 614). He stated that she was ambulatory, did not need special transportation and did not need someone to accompany her to appointments. (*Id.*). However, the doctor also noted that she needed assistance with dressing, transferring, mobility, taking her medications, meal preparation, shopping/errands, laundry and housework. (*Id.*). He noted she needed assistance with "ADL's" or activities of daily living. (*Id.*). In response to the question of whether Burnett could work at her usual occupation, Dr. Popoff wrote "doesn't work." (*Id.*). In response to the question of whether Burnett could work at any job, Dr. Popoff again wrote "doesn't work." (*Id.*). He then stated that she needed a clear Medicaid card with no HMOs and no managed care. (*Id.*).

On March 9, 2007, Dr. Ekole completed a medical needs form for Burnett, diagnosing her with hypertension, coronary artery disease, congestive heart failure, and possibly degenerative joint disease ("DJD") (though the handwriting for this last condition is difficult to discern). (Tr. 618). He also found that she was ambulatory, did not need special transportation and did not need to be accompanied to appointments. (*Id.*). However, he found that she needed help with dressing, taking medications, meal preparation, shopping, laundry, and housework. (*Id.*). He reported that she could not work either at her usual occupation or at any occupation for a "lifetime." (*Id.*).

On June 15, 2007, Dr. Ekole completed a physical capacities assessment for Burnett, diagnosing her with anemia and hepatocellular carcinoma, or liver cancer.[2] (Tr. 891). He found that she could never sit, stand, walk, lift any weight, bend, squat, crawl, kneel, reach, grasp, push, pull, stair climb or climb. (*Id.*). He wrote that Burnett was "severely debilitated to work."

---

[2] Burnett never reported that she suffered from liver cancer and there are no treating records anywhere in the file supporting such a diagnosis.

16

(*Id.*).  He noted that he had examined Burnett that same day.  (*Id.*).

On June 28, 2007, Dr. Ekole completed a medical examination report for Burnett diagnosing her with bilateral carpel tunnel syndrome, L5-S1 radiculopathy, peroneal neuropathy, obesity, osteoarthritis, hypertension, congestive heart failure and COPD.  (Tr. 627-28).  Upon examination, he noted that her ability to dress and undress, her stance, gait, fatigue, pain level and alertness were all normal, except that she has to walk with a cane and had a deformed stature.  (*Id.*).  He reported pedal edema, decreased airflow and wheezing, decreased range of motion in her lower back and knees, and that an EMG conducted that day had revealed the CTS, radiculopathy and neuropathy.  (*Id.*).  He found her mood to be depressed.  (*Id.*).  He noted that her liver function was normal.  He determined that her condition was deteriorating.  (*Id.*).  He found that she could lift 10 pounds occasionally, had no limitations in standing or sitting, except that she ambulated with a cane, could not operate foot controls, but had no manipulative or mental limitations.  (*Id.*).  He found that she could not meet her needs in her home because she needed assistance with light housework.  (*Id.*).

On March 28, 2008, Dr. Verbovsky completed a medical needs form for Burnett, diagnosing her with high blood pressure, dyslipidemia (high cholesterol), gastroesophageal reflux disease ("GERD"), COPD, sleep apnea, and bilateral CTS.  (Tr. 619).  He reported that she was ambulatory and did not need assistance or special transportation to come to appointments.  (*Id.*).   He found that she did need assistance in dressing, mobility, shopping, laundry and housework.  (*Id.*).   He concluded that she was unable to work either at her usual occupation or at any occupation, noting that she "hasn't work in 8 years and doubt she ever will work."  (*Id.*).  The same day, Dr. Verbovsky completed a medical examination report for Burnett which contained the same diagnoses.  (Tr. 621).  He limited her to lifting less than 10 pounds

17

frequently and 10 pounds occasionally, standing or walking less than 2 hours a day and sitting less than 6 hours a day. (*Id.*). She required a cane to ambulate and braces on her wrists. (*Id.*). He found that she had limitations in concentration, sustained concentration, memory and following simple instructions due to prolonged drowsiness from her sleep apnea. (*Id.*). He reported that his conclusions were supported by "medical records (old)." (*Id.*).

b.   <u>Consultative and Non-Examining Sources</u>

*i.*   *Physical*

On April 19, 2003, Burnett was examined by Dr. L. Patel for the State of Michigan. (Tr. 513-518). Burnett reported that she ambulated with a cane, was unable to walk more than ¼ of a block, stand 5-10 minutes, and needed to sit with her leg elevated. (Tr. 513). She also complained of intermittent back pain. (*Id.*). She was reported to be independent in basic activities of daily living and personal care. (*Id.*). Upon examination, Dr. Patel found Burnett to be obese, but able to walk with a normal gait with a cane. (Tr. 514). He found no peripheral edema, tenderness or swelling in any joint. (*Id.*). While there was some swelling in her right calf, her muscle tone and strength was normal in all extremities except for her right ankle. (Tr. 514-15). He found no tenderness or limitation on range of motion in her spine, and a straight leg raising test was negative. (Tr. 515). Burnett's flexation was normal in her hips and knees, except that she could only elevate to 90 degrees in her hips. (Tr. 516). He found that her right ankle flexation was below normal, but that she was not attempting maximum effort. (*Id.*). Dr. Patel found Burnett capable of dressing, buttoning clothing, tying shoe laces, picking up a coin and pencil and writing without difficulty. (*Id.*). Burnett refused to toe-, heel-, or tandem-walk. (*Id.*). Dr. Patel found that Burnett was able to sit and stand, and bend and stoop a limited amount. (*Id.*). He found she was unable to carry, push or pull due to the constant pain her right

18

leg per her history.  (*Id.*).  He concluded that she should be able to ambulate without a cane. (*Id.*).

On May 14, 2003, medical consultant Michael Sullivan rendered an RFC assessment for Burnett based on a review of her records.  (Tr. 542-49).  He concluded she was capable of lifting 10 pounds occasionally and 5 pounds frequently, standing 2 hours in an 8-hour work day with the assistance of a cane for ambulation and balance, and could sit an unlimited amount of time with her right foot elevated.  (Tr. 543).  Her ability to push and pull was limited in her lower extremities.  (*Id.*).  He determined she could climb stairs occasionally, but never climb a ladder, rope or scaffolding.  (Tr. 544).  She could balance, stoop, kneel, crouch and crawl occasionally. (*Id.*).  She had no manipulative or mental limitations.  (Tr. 545).  He recommended that she avoid moderate exposure to vibration and all exposure to hazardous machinery and heights.  (Tr. 546). He found her partially credible.  (Tr. 547).

On January 9, 2006, Burnett was examined by Dr. Cynthia Shelby-Lane for the State of Michigan.  (Tr. 550-58).  Burnett reported that she ambulates with a cane due to chronic pain in her right foot, is unable to walk more than a ¼ of a block, stand more than 5-10 minutes and does not sit with her legs slightly elevated.  (Tr. 550).  She reported that her pain is aggravated by standing longer than five minutes, stooping, squatting, getting up, walking, lifting more than 10 pounds, stair climbing and driving.  (*Id.*).  She reported a history of obesity and depression.  (Tr. 551).  Upon examination, Dr. Shelby-Lane noted minimal tenderness in the lower lumbar area, right foot and ankle.  (Tr. 553).  There was minimal edema in Burnett's right foot.  (*Id.*).  Shelby-Lane noted crepitus with flexation and extension of both knees and a slow, wide-based gait. (*Id.*).  Burnett's pedal pulses were 2+ bilaterally and there was no muscle atrophy or joint deformity noted.  (*Id.*).  Burnett did not use a cane during the examination but walked with a

slight right-side limp. (*Id.*). Shelby-Lane noted Burnett was unable to toe-, heel-, or tandem-walk. Burnett was able to squat 10% and bend 30%. (*Id.*). A straight leg raising test was 0-40 degrees while lying down and 0-90 degrees while sitting. (*Id.*). Shelby-Lane's impression was right foot pain, obesity, hypertension and depression. (*Id.*).

Shelby-Lane assessed Burnett's current physical abilities as being able to carry out all of the physical abilities listed, as well as walk on heels, toes and tandem, and that she had grip strength of 5/5. (Tr. 557-58). Shelby-Lane also completed a functional capacity assessment for Burnett, finding that she could frequently and occasionally lift 10 pounds, could stand or walk less than 2 hours in an 8-hour day, with the assistance of a cane, had an unlimited ability to sit, push, pull, but could never climb, balance, kneel, stoop, crouch, or crawl. (Tr. 559-62). She found no manipulative or metal limitations, but found that Burnett should avoid hazardous machinery and heights. (Tr. 561-62).

On October 3, 2007, Burnett was examined by Dr. Sonia Ramirez for the State of Michigan. (Tr. 629-35). Her chief complaints were hypertension, congestive heart failure, obesity, arthritis of the legs and CTS. (Tr. 629). Burnett reported she could walk ¼ of a block, stand for five minutes and must sit with her legs elevated. (*Id.*). She reported that she constantly needs to stand up and sit down and that most of the time she lies down. (*Id.*). She reported being able to drive short distances, shop for groceries, lift five pounds or a gallon of milk and prepare some light meals. (*Id.*). Burnett reported that she wore braces for her carpal tunnel, especially if she needed to cook, but that she could comb her own hair. (Tr. 629-30). She reported that she used a cane mostly because of recent surgery on her right foot. (Tr. 630). Upon examination, Burnett weighed 335 pounds and reported gaining 60 pounds since 2000. (*Id.*). Dr. Ramirez noted that Burnett had difficulty getting on and off the examination table, and used a cane to

20

walk.  (Tr. 631).  There was some limitation on flexation and extension of Burnett's back, and some difficulty with abduction and adduction of her hips.  (*Id.*).  She could not bend or stoop because of her back and her obesity.  (*Id.*).  There was no limitation on flexation of Burnett's knees, but some pain in the right ankle and knee.  (*Id.*).  A straight leg raising test was negative.  (*Id.*).  Ramirez noted that both of Burnett's wrists were sore, but they were not swollen or inflamed and there was no limitation in range of motion.  (*Id.*).  Burnett was unable to tandem walk both because of her obesity and because of her recent foot surgery.  (*Id.*).  Her grip strength was normal bilaterally.  (*Id.*).  Dr. Ramirez's impression was that Burnett's present problems were severe depression, arthritis and morbid obesity.  (*Id.*).

An RFC assessment was rendered by Dr. Muhammad Khalid based on Dr. Ramirez's examination.  (Tr. 641-48).  Dr. Khalid found that Burnett was capable of frequently and occasionally lifting 10 pounds, standing or walking 2 hours in an 8-hour day, using a cane to ambulate, and sitting about 6 hours.  (Tr. 642).  Her ability to push and pull was unlimited with the above-issued weight restrictions.  (*Id.*).  He found Burnett able to climb ramps and stairs occasionally, as well as occasionally balance, stoop, kneel, crouch and crawl, but never climb ladders.  (Tr. 643).  He found no manipulative limitations.  (Tr. 644).  Dr. Khalid's notes appear to state that he adopted an RFC determination rendered by the ALJ in Burnett's 2006 decision because "there is no change."  (Tr. 643).  However, he additionally found that she should avoid moderate exposure to vibration and fumes and odors, due to her CTS and COPD, two limitations not included in the 2006 RFC assessment.  (Tr. 645; 298).  In addition, he noted no limitation in Burnett's ability to work around hazardous machinery and heights, a limitation included in the 2006 assessment.  (*Id.*).

On September 23, 2008, Burnett was again examined by a doctor for the State of

Michigan, Dr. L. Banerji. (Tr. 906-909). Burnett reported being a known diabetic since June 2008, being diagnosed with congestive heart failure five years prior, and also being diagnosed with sleep apnea, COPD, GERD, CTS, lower back pain and depression. (Tr. 906-907). Burnett reported being able to make a fist, fasten buttons, tie and untie shoe laces, write legibly, push, pull, cook, and do light housework. (Tr. 907). She could lift and carry five to ten pounds. (*Id.*). She also could take care of her own personal hygiene, and could dress and drive herself. (*Id.*). Burnett reported being able to walk seven or eight houses at street level, climb two or three stairs, stand for five minutes, sit for two hours and lie on her back for several hours. (*Id.*).

Upon examination, Dr. Banerji found that Burnett could stand without support and had no tenderness over her spine. (Tr. 908). Her lumbar movements were pain free and of normal range, except flexation was 85 degrees due to obesity. (*Id.*). A straight leg raising test was 75 degrees bilaterally and pain free. (*Id.*). Knee flexation was 20 degrees with no pain but crepitus in both knees. (*Id.*). There was no pain, swelling or limitation in any other joint and no muscle wasting around joints. Burnett's grip strength was 5/5 bilaterally. (*Id.*). Dr. Banerji found that Burnett could walk with short, slow paces without a cane, but that she could not walk tip-toe, heel or tandem, or squat more than 205 degrees due to pain in her knee. (*Id.*). She was able to get up from supine position and get on and off the exam table without help. (*Id.*). She could undress, dress and open a door and had no loss of dexterity in her fingers. (*Id.*). Dr. Banerji's impression was that Burnett's diabetes was fairly well-controlled and there was no evidence of complication such as neuropathy or retinopathy. (*Id.*). In addition, Dr. Banerji found no abnormal physical findings related to arthritis or CTS except for those noted above. (*Id.*). He also found that Burnett's memory and response was good despite her alleged depression and that there were no limitations in mobility from her exogenous obesity, except for difficulty bending

and squatting.  (Tr. 909).

### ii.     Mental

On April 19, 2003, Burnett was evaluated by psychiatrist Monir DiBai for the State of Michigan.  (Tr. 519-22).  Burnett reported depression, crying spells and former suicidal thoughts, though no recent such thoughts.  (Tr. 519).  She reported that she had a scheduled appointment with a psychiatrist in a few days and that in January 2002 she was put on Zoloft but suffered hallucinations from the medicine and stopped taking it.  (*Id.*).  Burnett complained of insomnia and also that her myriad medications made her sleepy during the day such that she oversleeps and then cannot sleep at night.  (Tr. 519-20).  She reported limiting social interaction due to lack of interest.  (Tr. 520).  Dr. DiBai noted that Burnett was crying incessantly during the interview. (*Id.*).  Upon examination, the doctor found Burnett's contact with reality marginal, self-esteem and motivation poor, and that Burnett did not exaggerate or minimize her symptoms.  (Tr. 521). Burnett appeared depressed and tearful.  (*Id.*).  She was able to remember five digits forward, but did not attempt to recall any backward.  (*Id.*).  She was able to report her birthdate and age, and one recent president.  (*Id.*).  She did not make an effort to interpret a proverb, attempted only two calculations and found no differences between an apple and an orange.  (Tr. 523).  Dr. DiBai assessed Burnett with major depressive disorder, single episode and assessed a global functioning score ("GAF") of 55.  (*Id.*).

On May 20, 2003, medical consultant J. Tripp issued a psychiatric review of Burnett based on Dr. DiBai's examination.  (Tr. 528-41).  He found that she had a depressed affective disorder characterized by loss of interest in activities, sleep disturbances, feelings of guilt or worthlessness, difficulty concentrating and hallucinations, delusions or paranoid thinking.  (Tr. 528-31).  Tripp determined that Burnett had moderate limitations in her activities of daily living

23

and her ability to maintain concentration, persistence and pace ("CPP") with no episodes of decompensation. (Tr. 538). On the same day, Tripp also assessed Burnett's mental RFC. (Tr. Tr. 524-27). He found her moderately limited in her ability to understand, remember and carry out detailed instructions, work in close proximity with others and to set realistic goals. (Tr. 524-250. He found her capable of performing simple, sustained, unskilled work. (Tr. 526).

On January 9, 2006, Burnett was examined by psychologist Nick Boneff for the State of Michigan. (Tr. 564-68). She drove to the appointment herself. (Tr. 564). Speaking about losing her job, Burnett began crying. (*Id.*). Burnett reported that she had been in outpatient therapy previously for depression and had been prescribed both Zoloft and Wellbutrin, but was no longer taking either. (Tr. 565). During the testing, Burnett complained of headaches and spoke very quietly even when asked to speak up. (*Id.*). The results of her psychological and IQ tests resulted in scores far below what Dr. Boneff believed Burnett capable of, based on her history of graduating from high school in regular courses and her reported daily activities including reading the Bible and magazines. (Tr. 564-65). The scores placed her reading at the second grade level and arithmetic at the preschool level. (Tr. 565). Dr. Boneff believed that the scores were invalid and were the result of lack of effort on Burnett's part. (Tr. 564-65). As a result, Dr. Boneff declined to issue a prognosis or other assessment based on the test results, only diagnosing Burnett with depression not otherwise specified. (Tr. 628).

On October 3, 2007, Burnett was again examined for the State of Michigan, this time by Dr. F. Qadir, a psychiatrist. (Tr. 637-39). She reported a depressed mood because of her pain and inability to work, poor sleep and increased eating. (Tr. 637). She reported previous psychiatric treatment and medication but that the medication did not work so she stopped taking it. (*Id.*). Upon examination, Dr. Qadir found Burnett's contact with reality to be good, her self-

24

esteem average, and no motivation but good insight.  (Tr. 638).  He found that she was neither exaggerating nor minimizing her symptoms.  (*Id.*).  She could recall six numbers forward and five backward, recalled three objects and named one president.  (*Id.*).  She could add change, do basic arithmetic, interpret a proverb, compare and contrast two objects and suggest appropriate action in different situations.  (Tr. 639).  Dr. Qadir assessed Burnett with major depression, recurrent-moderate and issued her a GAF score of 50 with a guarded prognosis.  (*Id.*).

On December 17, 2007, doctor Ashok Kaul issued a psychiatric review technique for Burnett.  (Tr. 649-62).  He found that she had an affective disorder characterized as "major depression moderate."  (Tr. 649; 652).  He found her moderately limited in her ability to maintain social functioning and maintain CPP with no episodes of decompensation.  (Tr. 659).  On the same day, Dr. Kaul assessed Burnett's mental RFC.  (Tr. 663-66).  He found that she was moderately limited in her ability to work in close proximity to others and the general public.  (Tr. 663-64).  He concluded that Burnett was "able to understand, remember and carry out simple instruction on a sustained basis and is capable of simple unskilled work encompassing 4 to 5 instructions not in proximity to others and not with the public."  (Tr. 665).

### 4.   *Vocational Expert's Testimony*

VE Harry Cynowa testified at the hearing before the ALJ.  The ALJ asked the VE to imagine a claimant with Burnett's vocational history who could

> perform simple unskilled work with four to five-step instructions, not in close proximity to coworkers and the public, and lift and carry with one hand 10 to 15 pounds occasionally.  Stand and walk two hours [ ] five to 10 minutes without interruption using a cane to ambulate . . . and for balance.  With sitting eight hours.  Pushing and pulling with the upper extremities consistent with those weight restrictions.  Could use the right foot occasionally.  Avoiding unprotected heights, moving machinery.  With elevation of the right ankle [ ] 12 to 15 inches.  No climbing or balancing.  Avoid repetitive bending.  And a job that would allow her to lie down during scheduled breaks and no driving.

25

(Tr. 1520).  In response, the VE testified that there were jobs that such a person could perform, including as a visual inspector or sorter (1,500 jobs in the region), as a bench assembler (3,250 jobs in the region) or as a hand packager (3,250 jobs in the region).  (Tr. 1520-21).  The ALJ then modified the hypothetical to permit the claimant to lie down during unscheduled breaks, to which the VE testified that such a modification would preclude the above-listed jobs.  (Tr. 1521). The ALJ then asked the VE whether a modification to include only occasional fine manipulation would affect the jobs that could otherwise be performed, and the VE testified that such a restriction would preclude those positions.  (*Id.*).

### C.    Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of

26

age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueunieman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.      The ALJ's Findings

In his decision, the ALJ found that Burnett had not engaged in substantial gainful activity since her alleged onset date of August 9, 2006.  (Tr. 928).  He found that she had the following severe impairments:  depression, arthritis, obstructive sleep apnea, bilateral CTS, diabetes mellitus, and morbid obesity.  (*Id.*).  He then determined that Burnett's severe impairments, either alone or in combination, did not meet or medically equal a listed impairment.  (*Id.*).  In rendering this finding, the ALJ assessed Burnett's depression under the criteria of listing 12.04, finding that she had mild limitations in activities of daily living and social functioning, moderate limitations in CPP, and no episodes of decompensation.  (Tr. 928-29).  The ALJ then determined Burnett's RFC.  (Tr. 929-30).  Generally, an ALJ is bound by the RFC assessment of a previous ALJ decision, unless the ALJ determines there is additional evidence demonstrating changes in the claimant's conditions.  *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997); Soc. Sec. Ruling 98-5.  Here, the ALJ determined that there had been a change in Burnett's

condition since the prior decision, which he stated was reflected in his RFC assessment.  (Tr.

931).  The ALJ determined that Burnett had the RFC to perform:

> sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except
> that the claimant requires simple unskilled work activity with only 4-5
> step instruction[s].  The claimant is unable to work in close proximity to
> co-workers or the public.  The claimant [can] lift 10-15 pounds with one
> hand occasionally (up to 1/3 of an 8-hour workday).  The claimant can
> stand/walk for a total of 2 hours in an 8-hour workday and for 5-10
> minutes at one time without interruption while using a cane to ambulate
> and for balance.  The claimant can sit for 8 hours in an 8-hour workday.
> The claimant can perform pushing and pulling motions with the upper
> extremities with the aforementioned weight restrictions.  The claimant can
> occasionally use her right lower extremity.  The claimant should avoid
> unprotected heights and moving machinery.  The claimant must elevate
> the right ankle 12-15 inches.  The claimant is unable to climb or balance.
> The claimant should avoid repetitive bending.  The claimant has to recline
> during scheduled breaks.  The claimant is unable to drive.

(Tr. 929-30).   The ALJ then determined that, based on this RFC assessment, Burnett was

incapable of performing past work.  (Tr. 935).  However, relying on VE testimony, the ALJ

concluded that there were a significant number of jobs existing in the national economy that

Burnett could still perform given her RFC, age, education and vocational experience.  (Tr. 936-

37).  In explaining his assessment of the evidence, the ALJ incorporated, by reference, the

discussion of previously submitted evidence included in the previously-remanded ALJ decision

of 2006, noting that there was no dispute regarding the evidence as presented in that decision.

(Tr. 931).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative

decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the

Court "must affirm the Commissioner's conclusions absent a determination that the

Commissioner has failed to apply the correct legal standard or has made findings of fact

unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).   Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).   In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).   There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).   If the Commissioner's decision is

29

supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.   Analysis

Burnett argues that the ALJ's decision is not supported by substantial evidence because he "failed to give controlling weight to any objective medical evidence [instead] substituting his own findings for that of the medical doctors."  [12 at 8].  In addition, Burnett argues that the ALJ's RFC assessment failed to take into account all of her credible limitations, specifically her CTS, obesity, the side effects of her medications, her complaints of pain, her need to lie down at unscheduled times, or her moderate limitation in CPP.  Finally, Burnett argues that the ALJ failed to consider the need for her to be able to perform work on a sustained and continuous basis, eight hours a day, five days a week.

#### 1.   *Treating Physician Opinions*

Burnett argues that the ALJ failed to give due consideration to the opinions of her treating physicians, rejecting them without good reason when he should have, at the very least, recontacted the treating physician for clarification.  She also argues that the ALJ failed to even discuss the examination of consulting physician Dr. Shelby-Lane that found greater limitations than the ALJ himself assessed.

An ALJ must give a treating physician's opinion controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) *quoting* 20 C.F.R. § 404.1527(d)(2).  If an ALJ declines

to give a treating physician's opinion controlling weight, she must then determine how much weight to give the opinion, "by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) *citing Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(d)(2).  The ALJ must give good reasons, supported by substantial evidence in the record, for the ultimate weight given to a treating source opinion. *Id.*, *citing Soc. Sec. Rul*. 96-2p, 1996 SSR LEXIS 9 at *12, 1996 WL 374188 at *5.  An ALJ is not required to give any special weight to a treating source's conclusion that a claimant is disabled, as this conclusion is reserved to the Commissioner alone, based on all the evidence of record.  20 C.F. R. § 404.1527(e)(1), (e)(3).

Here, the ALJ laid out each of Burnett's treating physician's opinions, and ultimately found that the medical evidence did not support the limitations those physicians imposed.  (Tr. 931-33).   Contrary to Burnett's assertion that the ALJ "dismiss[ed] the objective medical opinions of [her treating physicians] without any rationale," [12 at 13], the ALJ amply supported his finding by detailing medical records that contradicted the severity of the conditions cited by Burnett's treating physicians, and upon which they based their conclusions that she was unable to work.  (Tr. 933).   The ALJ noted that an x-ray of Burnett's knee showed only minimal degenerative changes and a specialist consulted regarding her CTS opted for conservative treatment and a subsequent EMG showed improvement in her condition.  (*Id.*).   An ECG and stress-test on Burnett's heart was normal and an x-ray of her chest revealed no active disease. (*Id.*).   She also reported doing well with regard to her hypersomnolence.  (*Id.*).   Assessing these records in light of the restrictions imposed by the treating physicians, the ALJ noted that the

31

limitations suggested by the treating physicians did not comport with their treatment records or Burnett's activities of daily living.  (*Id.*).  For example, the ALJ noted that Dr. Ekole's June 15, 2007 limitations – that Burnett could not sit, stand, lift any weight, walk, bend, squat, crawl, kneel, reach, grasp, push, pull, or climb – would have left her "essentially bedridden," a state contradicted by her own reports and testimony.  (*Id.*).  The ALJ also noted that Dr. Ekole "did not identify any limitations regarding [Burnett's] ability to perform grasping, reaching, pushing, pulling, fine manipulation, sitting, standing, or walking," and that the same doctor "noted that [Burnett] had no mental limitations."  (*Id.*).  Thus, the ALJ's determination that the opinions of Drs. Popoff, Ekole and Verbovsky should be entitled only to limited weight is supported by good reasons in his decision and by substantial evidence in the record.

The court also disagrees with Burnett's contention that the ALJ should have recontacted the treating physicians for clarification.  [12 at 13].  As a general matter, "[t]he burden of providing a complete record, defined as evidence complete and detailed enough to enable the [Commissioner] to make a disability determination, rests with the claimant."  *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.3d 211, 214 (6th. Cir. 1986).  However, "under special circumstances – when a claimant is (1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures --  an ALJ has a special, heightened duty to develop the record."  *Wilson v. Comm'r of Soc. Sec.*, 280 Fed. Appx. 456, 459 (6th Cir. 2008) *citing Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051-52 (6th Cir. 1983).  The court in *Wilson* held that even where a claimant proceeds without counsel, to the extent she is capable of grasping the proceedings and adequately presents her case, no special duty is imposed on the ALJ to develop the record.  *Id.*

Burnett cites Social Security Ruling 96-5 in support of her argument that the ALJ should

have recontacted her treating physicians. This decision, codified in regulation at 20 C.F.R. § 404.1527(c)(3), requires an ALJ to recontact a treating physician when he or she cannot ascertain the basis of the physician's opinion from the record. However, "[u]nder this regulation, absent a finding of inconclusive or 'insufficient evidence to decide whether [a claimant is] disabled' an ALJ is not required to recontact a treating physician." *McNelis v. Comm'r of Soc. Sec.*, No. 08-12529, 2009 U.S. Dist. LEXIS 89792 at *26 (E.D. Mich. Sept. 29, 2009) quoting 20 C.F.R. § 404.1527(c)(3).

Here, there were myriad treatment notes in the record, most, if not all, of which contradicted, rather than supported or were inconclusive of, the opinions of Burnett's treating physicians regarding her limitations. The ALJ had no obligation to recontact the physicians in these circumstances.

Burnett takes issue with the ALJ's failure to mention the consulting evaluation of Dr. Shelby-Lane, which Burnett claims "is consistent with" the treating physician opinions discussed above. [12 at 12]. However, the ALJ included by reference the discussion of the evidence in the previous ALJ decision of 2006. (Tr. 931). That decision specifically discussed Dr. Shelby-Lane's consulting examination. (Tr. 296). Moreover, to the extent the ALJ found that the objective medical evidence contradicted the treating physicians' opinions, it would equally contradict the consulting physician opinion.[3] And, the ALJ did find (consistent with Dr. Shelby-Lane's opinion) that Burnett "can stand/walk for a total of 2 hours in an 8-hour workday," "can sit for 8 hours in an 8-hour workday," and can "perform pushing and pulling motions…") (*cf.* Tr. 559-562 with 930). Finally, the court notes that Burnett's arguments implicitly take issue with a number of Dr. Shelby-Lane's findings, including that Burnett had no trouble sitting and had no

---

[3] Overall, Shelby-Lane would impose far lesser restrictions on Burnett than would her treating physicians. *See supra*, at 19-20.

manipulative or mental limitations.  (Tr. 296).  Thus, although Burnett accuses the ALJ of cherry-picking the record to support his conclusions, it is she who appears willing to accept only certain of Dr. Shelby-Lane's findings.

> 2.    *The RFC Assessment's Portrayal of Burnett's Physical and Mental Limitations*

Burnett argues that the ALJ's RFC assessment failed to account for a number of her credible limitations, including her CTS, obesity, pain, need to lie down at unscheduled times, medication side effects, and moderate limitation in CPP.

The Sixth Circuit has held that an ALJ is in the best position to observe a witness's demeanor and to make an appropriate evaluation as to her credibility.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).  Thus, an ALJ's credibility determination will not be disturbed "absent compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).

> a.    <u>Carpal Tunnel Syndrome</u>

Burnett argues that the ALJ failed to consider her limitations due to her CTS in his RFC assessment.  However, as noted above, the ALJ determined that Burnett's CTS was not as severe as she alleged, based on the fact that her specialist had recommended conservative treatment and that a follow-up EMG had noted improvement of her condition.  (Tr. 933).  In addition, he noted that consulting physician Ramirez characterized Burnett's CTS as "mild to moderate" and Dr. Banerji noted that there "were no abnormal physical findings" in relation to her CTS.  (*Id.*). Therefore, the ALJ's decision not to include limitations in his RFC assessment based on Burnett's CTS is supported by substantial evidence in the record.

> b.    <u>Obesity</u>

Burnett argues that the ALJ failed to account for the effects of her morbid obesity on her ability to work.  Social Security Ruling 02-01p lays out the Social Security Administration's

policy on evaluating obesity.  It states that, because obesity "may cause or contribute to," among other things, "mental impairments such as depression," it should be taken into account when determining the effects of impairments on a claimant's ability to work, or whether or not a claimant's impairment or combination of impairments meets a listed impairment.  *SSR 02-01p*, 2002 SSR LEXIS 1 at *2-3, *6-7, 2000 WL 628049 (Sept. 12, 2002).  While the ALJ recognized this requirement in his opinion, he credited Dr. Banerji's opinion (based on his direct examination, *supra* pp. 22-23) that Burnett's obesity imposed no limitations on mobility, only on squatting and bending.  (Tr. 934).

Furthermore, Burnett did not list obesity as one of the conditions for which she was claiming disability.  (Tr. 1007-1015).  As the Sixth Circuit noted in *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 416 (6th Cir. 2011), obesity can only be considered where it is actually raised by the claimant in the first place.  Here, despite Burnett's failure to claim obesity as a contributing factor to her disability, the ALJ nevertheless found it to be a severe impairment, but not severe enough to justify additional limitations.  That finding is supported by substantial evidence in the record.

c.     <u>Pain</u>

Burnett argues that the ALJ failed to consider her credible complaints of unbearable pain in his assessment of her disabled status.  When a complaint of pain is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, he must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record" to determine if the claimant's claims regarding the level of her pain are credible.  *Soc. Sec. Rul. 96-*

7, 1996 SSR LEXIS 4 at *3, 1996 WL 374186 (July 2, 1996); *see also* 20 C.F.R. § 404.1529.

Here, the ALJ took note of Burnett's claims that she experienced pain described as an 8 on a scale of 1-10 with or without medication. (Tr. 931). However, the ALJ found her testimony not supported by the evidence in the record, and therefore not fully credible. (Tr. 935). Looking at the record as a whole, which this court is required to do, the court finds the ALJ's conclusion to be supported by substantial evidence. There appear to be only two instances in the record of a complaint by Burnett that her pain medication was not working. (Tr. 598-99; Tr. 852-53). Indeed, she routinely was seen by her doctors primarily for the purpose of medication refills, with no comment about their effectiveness. (*See e.g.* Tr. 596; 811; 812-13; 818-19; 836-37; 875-76; 1105-1106; 1112-13) Her pain level also did not prevent her from performing a number of activities of daily living including preparing light meals, taking her daughter to and from school, attending church, visiting family and driving short distances. (Tr. 294; 934; 1020-24). In addition, the ALJ did consider Burnett's pain level by requiring that she be permitted to lie down during scheduled breaks, which Burnett testified brought her relief from her pain. (Tr. 930; 1516, 1520).

In sum, the ALJ adequately considered Burnett's alleged pain, and his conclusion on that matter is supported by substantial evidence.

### d.      Need to Lie Down

Burnett argues that the ALJ failed to consider her need to lie down at unscheduled times. However, as noted above, *supra* at 32, the ALJ found, based on the medical evidence, that Burnett was not "bedridden," and he did generally take into account Burnett's need to lie down periodically by requiring that she be permitted to lie down during scheduled breaks. (Tr. 930). The ALJ's refusal to incorporate unscheduled lying down is also supported by his finding that

Burnett was not wholly credible. (Tr. 935). The court finds the ALJ's assessment of this alleged limitation to be supported by substantial evidence in the record.

e.    <u>Medication Side Effects</u>

Burnett argues that the ALJ failed to consider the reported side effects of her medication when determining that she was capable of working. Evaluation of a claimant's symptoms under the regulations requires consideration of all subjective complaints, including, but not limited to type, dosage, effectiveness and adverse side effects of any medication taken to alleviate symptoms. *See* 20 C.F.R. § 404.1529(c)(3)(iv). However, the applicable regulation does not require the ALJ to explain her consideration of this factor in her written decision. *Id.*; *see also Hale v. Comm'r of Soc. Sec.*, no. 10-10751, 2011 U.S. Dist. LEXIS 46865 at *8, 2011 WL 1641892 (E.D. Mich. May 2, 2011).

Here, the ALJ noted that Burnett alleged that her medications made her drowsy and that she had to nap 15-20 minutes a day. (Tr. 931). He also noted that Burnett informed her treating physician in 2006 that she experienced no side effects to her medications. (Tr.933). On this record, the ALJ was not required to find that the alleged side effects of Burnett's medications caused any additional limitations above those he found credible in his decision.

Moreover, while there is one instance in the record, specifically with a consulting examiner, where Burnett reported drowsiness as a side effect of her medication, (Tr. 519-20), as outlined in the background section above, Burnett only once reported any medication side effects to a treating physician, and then only with regard to her underperformance on a psychological test. (Tr. 1396). She never reported the other side effects she now alleges exist, including dizziness, urination and bowel movement problems, sleep problems (other than drowsiness), weakness or fatigue.

37

f.      Moderate Limitation in Concentration, Persistence and Pace

Finally, Burnett argues that the ALJ's RFC assessment failed to account for her moderate limitation in CPP.  The ALJ limited Burnett to "simple, unskilled work activity with only 4-5 step instructions."  (Tr. 929-30).

Here, the ALJ's limitations to simple unskilled work with 4-5 step instructions fully accounts for Burnett's moderate limitation in CPP because they are consistent with the findings of the consultative medical examiner Dr. Kaul, who specifically recommended those limitations. (Tr. 665).  Furthermore, of her treating physicians, only Dr. Verbovsky found that Burnett suffered from mental limitations, described as limitations in comprehension, memory, concentration and following simple instructions, which he determined were the result of her drowsiness from her sleep apnea.  (Tr. 621).  However, he did not issue any restrictions based on these limitations (other than concluding that Burnett was incapable of working, which, for reasons discussed above, the ALJ rejected).  Thus, the court finds the ALJ's RFC assessment not inconsistent with this opinion, and that it is otherwise supported by substantial evidence in the record, especially considering the ALJ found that the evidence supported the conclusion that Burnett's sleep apnea was well-controlled.  (Tr. 933).

Based on the above, the court finds that the ALJ's RFC assessment as a whole accurately accounted for all of Burnett's credible limitations and is supported by the law and substantial evidence in the record.

3.      *Burnett's Ability to Sustain Work*

Finally, Burnett argues that the ALJ did not account for the fact that she would have to sustain work on an eight-hour-a-day basis, five days a week.  In support of her arguments she cites Social Security Ruling 96-8p, which states, in pertinent part:

> the adjudicator must discuss the individual's ability to perform sustained work activates in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.)

1996 SSR LEXIS 5 at *19, 1996 WL 374184 (July 2, 1006).

Contrary to Burnett's argument, the ALJ did consider her need to be capable of performing work on a continuing and sustained basis. Throughout his RFC assessment he rendered determinations based on an eight-hour work day and set forth the maximum number of hours a day Burnett could perform certain tasks, including sitting, standing and walking. (Tr. 929-30). He even went so far as to break that time down further, finding, for example, that Burnett could only stand or walk in 5-10 minute increments, which needed to be followed by a period of sitting. (Tr. 930). Finally, the ALJ specifically stated in his decision that Burnett's limitations "will not interfere with her ability to function independently, appropriately, effectively and on a sustained basis." (Tr. 935). The court finds that the ALJ fully complied with the directive in SSR 96-8p.

### C.    CONCLUSION

For the foregoing reasons, the court **RECOMMENDS** that Burnett's Motion for Summary Judgment **[12]** be **DENIED**, the Commissioner's Motion **[19]** be **GRANTED** and this case be **AFFIRMED**.

Dated: July 9, 2012                           s/David R. Grand
Ann Arbor, Michigan                      DAVID R. GRAND
                                                       United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.   *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).   The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.   *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).   Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 9, 2012.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager

40